**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANAND ROY, derivatively on behalf of TELADOC HEALTH, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>JASON N. GOREVIC, MALA MURTHY, J. ERIC EVANS, SANDRA FENWICK, CATHERINE JACOBSON, THOMAS G. MCKINLEY, KENNETH PAULUS, DAVID SHEDLARZ, MARK DOUGLAS SMITH, DAVID B. SNOW, JR., KAREN DANIEL, and WILLIAM H. FRIST<br><br>Defendants,<br><br>and<br><br>TELADOC HEALTH, INC.,<br><br>Nominal Defendant. | Case No.: 1:24-cv-04651<br><br>**DEMAND FOR JURY TRIAL** |

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Teladoc Health, Inc. ("Teladoc" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Jason N. Gorevic ("Gorevic"), Mala Murthy ("Murthy"), J. Eric Evans ("Evans"), Sandra Fenwick ("Fenwick"), William H. Frist ("Frist"), Catherine Jacobson ("Jacobson"), Thomas G. McKinley ("McKinley"), Kenneth Paulus ("Paulus"), David Shedlarz ("Shedlarz"), Mark Douglas Smith ("Smith"), David

B. Snow, Jr. ("Snow, Jr."), and Karen Daniel ("Daniel"), (collectively, the "Individual Defendants," and together with Teladoc, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Teladoc, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Gorevic and Murthy for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Teladoc, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Teladoc's current and/or former directors and officers from November 2, 2022 until February 20, 2024, both dates inclusive (the "Relevant Period").

2. Teladoc offers online health services to consumers, including mental health services, primary care and chronic disease management services. Teladoc's mission is "to empower all people everywhere to live their healthiest lives by transforming the healthcare experience."

3. Teladoc's largest division is an online mental health counseling platform called "BetterHelp," which is a service mainly marketed and sold directly to consumers. BetterHelp includes "virtual therapy and other wellness services provided on a global basis."

4. BetterHelp garnered 420,000 paying users in the first quarter of 2024 ("Q1-2024") making BetterHelp the largest direct-to-consumer online mental health counseling provider in the United States. As such, BetterHelp's business constitutes about 42% of Teladoc's overall revenue, making BetterHelp the single largest contributor to Teladoc's overall revenue. For instance, for the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), BetterHelp generated $1.1 billion in revenue.

5. Defendant Murthy, the Company's Chief Financial Officer ("CFO"), and Defendant Gorevic, the Company's Chief Executive Officer ("CEO") at the time, attended Piper Sandler's Annual Healthcare Conference (the "Conference") on November 30, 2022.

6. In her presentation, Defendant Murthy mentioned a potential decrease in future marketing and advertising spending on the Company's BetterHelp segment in comparison to the last few years. Specifically, she stated, "we have talked about the ad spending about BetterHelp business moderating in 4Q, right?" She then went on to explain what this decrease in spending would look like, describing it as "a sequential pullback in ad spending." Defendant Murthy went on to state the following regarding the Company's position on the cost of BetterHelp's advertising campaigns:

> I will also say just because we are pulling back spending does not mean that we are not spending at all, right? Like it's not that we are going far, far from that. So we continue to have spending in the BetterHelp business, and we are essentially looking to the ad prices and deciding where we want to be.

7. As an attendee, Defendant Gorevic also discussed the Company's financial plans. Specifically, he described the future course of action the Company planned to take, such as "doing

more in larger media sort of mass media outlets. And some of that's just in response to the fact that the price of advertising in those mass media channels has come down."

8. The truth began to emerge on February 20, 2024, when the Company filed a current report on Form 8-K (the "February 2024 8-K") with the SEC. The February 2024 8-K announced the Company's financial results for the fourth quarter of the 2023 Fiscal Year.

9. That same day, the Company held an earnings conference call with investors and analysts to discuss the Company's financial results for the fourth quarter of the 2023 Fiscal Year (the "Q4-2023 Earnings Call"). The discussion during the Q4-2023 Earnings Call indicated a significant increase in advertising costs for the Company, which directly cut against the projections made by Gorevic and Murthy during the Piper Sandler Annual Healthcare Conference.

10. While on the Q4-2023 Earnings Call, Defendant Gorevic divulged the stunted revenue growth of the Company, describing it as flat compared to the prior year and down 3% sequentially. Defendant Gorevic then attributed the poor revenue figures to BetterHelp, stating the following:

> Revenue and margins were below our expectations in the quarter as we saw lower yields on marketing spend. Specifically, we experienced returns on our social media advertising that were below target in the second half of the year, which was a departure relative to the first half. BetterHelp outlook assumes the lower yields experienced in certain channels in the second half of 2023 will persist, and, as a result, will impact our year-over-year growth rates in the first half of 2024.

11. The truth then fully emerged on February 23, 2024 when the Company filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K").

12. The 2023 10-K indicated that the Company's advertising and marketing spending had increased by more than $65.3 million from 2022 to 2023, going from $623.5 million in 2022 to $668.8 million in 2023. In the year prior, advertising and marketing expenses increased over $200 million in one year, going from $416.7 million in 2021 to $623.5 million in 2022.

13. The 2023 10-K attributed the increase in advertising and marketing spending to "[h]igher digital and media advertising costs related to BetterHelp."

14. Analysts reacted negatively to this news. Gil Luria, a Davidson stock analyst, wrote that the "business is proving difficult to grow with existing marketing dollars and strategies."

15. On this news, the Company's stock price fell $15.64 per share, or 23.6%, overnight from closing at $20.49 per share on February 20, 2024 to $15.64 per share on February 21, 2024.

16. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Teladoc, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) despite public representations that Teladoc would reduce BetterHelp's spending on advertising and overall marketing, Teladoc actually increased BetterHelp's marketing budget throughout the 2023 Fiscal Year; (ii) the increase in spending on marketing BetterHelp had a severely negative impact on Teladoc's revenue; (iii) BetterHelp's membership figures plateaued and then fell in the 2023 Fiscal Year as a result of market saturation largely brought on by BetterHelp's own extensive advertising and marketing; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

17. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

18. In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO and its current interim CEO and Principal Financial Officer ("PFO"), who was the former Chief Financial Officer ("CFO") for all of the 2023 Fiscal Year, to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19. The Company has been substantially damaged because of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

20. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Sections 10(b) and 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) promulgated thereunder. Plaintiff's claims also raise a

federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24. Venue is proper in this District pursuant to 28 U.S.C. 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

25. Plaintiff is a current shareholder of Teladoc. Plaintiff has continuously held Teladoc common stock since first purchasing the stock November 24, 2020.

### Nominal Defendant Teladoc

26. Teladoc is a Delaware corporation with its principal executive office in New York at 2 Manhattanville Road, Suite 203, Purchase, NY 10577. Teladoc's shares trade on the NYSE Capital Market ("NYSE") under the ticker symbol "TDOC."

### Defendant Gorevic

27. Defendant Gorevic served as the Company's CEO and as a Company director from June 2009 until April 2024. According to the Company's Schedule 14A filed with the SEC on April 9, 2024 (the "2024 Proxy Statement"), as of March 28, 2024, Defendant Gorevic beneficially owned 653,073 shares of the Company's common stock. Given that the price of the Company's

common stock at the close of trading on March 28, 2024 was $15.10, Defendant Gorevic owned approximately $9,861,402 worth of Teladoc common stock as of that date.

28. In the 2023 Fiscal Year, Defendant Gorevic received $11,613,736 in compensation from the Company. This included $764,167 in salary, $10,000,006 in stock awards, $836,363 in non-equity incentive plan compensation, and $13,200 in all other compensation. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Gorevic received $10,876,053 in compensation from the Company. This included $695,833 in salary, $10,000,020 in stock awards, $168,000 in non-equity incentive plan compensation, and $12,200 in all other compensation.

29. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Gorevic made the following sales of Company stock:

| **Date** | **Number of Shares** | **Avg. Price/Share** | **Proceeds** |
|---|---|---|---|
| March 2,2023 | 8,262 | $25.36 | $209,524 |
| March 3, 2023 | 22,040 | $25.91 | $571,056 |
| June 2, 2023 | 2,802 | $24.38 | $68,313 |
| July 27, 2023 | 10,000 | $30.03 | $300,300 |
| September 5, 2023 | 2,864 | $22.89 | $65,557 |
| December 4, 2023 | 2,877 | $18.90 | $54,375 |

Thus, in total, before the fraud was exposed, he sold 48,845 shares of Company stock on inside information, for which he received approximately $1,269,125 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

30. The Company's Schedule 14A filed with the SEC on April 11, 2024 (the "the 2023 Proxy Statement"), stated the following about Defendant Gorevic:

> ***Jason Gorevic***
> Key Experience and Qualifications

- Our Board has concluded that Mr. Gorevic should serve as a director because of his leadership role with Teladoc and his extensive knowledge of the healthcare industry.

Career Highlights

- ***Teladoc, Inc.***
  - Chief Executive Officer and Director (June 2009 to 2024)
- ***Wellpoint, Inc.*** *(now Anthem Inc.)*
  - Chief Marketing and Product Officer (2007 to 2008)
  - President, Empire BlueCross BlueShield (2005 to 2006)
- ***Empire Bluecross Blueshield***
  - Chief Sales and Marketing Officer (2002 to 2005)
- ***Gemfinity*** *(an electronic marketplace and purchasing aggregator)*
  - Founder and Chief Executive (2000 to 2001)
- ***Mail.com, Inc.*** *(a provider of internet messaging services)*
  - General Manager of Business Messaging (1999 to 2000)
  - Vice President of Operations (1998 to 1999)
- ***Oxford Health Plans, Inc.***
  - Served in a variety of leadership positions in marketing, medical management and operations, as well as Director of Service Strategy (1993 to 1998)

Other Current Public Company Boards

- ***Kemper Corporation***

Education

- B.A. in International Relations, University of Pennsylvania

**Defendant Murthy**

31. Defendant Murthy has served as the Company's interim CEO and PFO since April 2024 and was previously the Company's CFO from 2019 to 2024. According to the Company's 2024 Proxy Statement, as of March 28, 2024, Defendant Murthy beneficially owned 71,716 shares of the Company's common stock as of that date. Given that the price of the Company's common stock at the close of trading on March 28, 2024 was $15.10 per share, Defendant Murthy owned approximately $1,082,912 worth of Teladoc stock as of that date.

32. For the 2023 Fiscal Year, Defendant Murthy received $5,944,842 in compensation from the Company. This included $516,667 in salary, $4,999,975 in stock awards, $415,000 in non-equity incentive plan compensation, and $13,200 in all other compensation. For the 2022 Fiscal Year, Defendant Murthy received $9,949,265 in compensation from the Company. This

included $493,333 in salary, $6,799,959 in stock awards, $2,399,973 in option awards, $243,800 in non-equity incentive plan compensation, and $12,200 in all other compensation.

33. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Murthy made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 2, 2023 | 7,605 | $25.36 | $192,863 |
| March 3, 2023 | 7,438 | $25.91 | $192,719 |
| June 2, 2023 | 6,241 | $24.38 | $152,156 |
| September 5, 2023 | 3,221 | $22.89 | $73,729 |
| December 4, 2023 | 3,004 | $18.90 | $56,776 |

Thus, in total, before the fraud was exposed, she sold 27,509 shares of Company stock on inside information, for which she received approximately $668,243 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

34. The 2024 Proxy Statement stated the following about Defendant Murthy:

> ***Mala Murthy — Interim Chief Executive Officer and Principal Financial Officer***
> Career Highlights
>
> - ***Teladoc, Inc.***
>     - Interim Chief Executive Officer and Principal Financial Officer (2024 to present)
>     - Chief Financial Officer (2019 to 2024)
>     - Ms. Murthy leads our global finance organization, including accounting, financial planning & analysis and investor relations. With a focus on assuring stockholder value, she is a seasoned leader with a proven track record of driving balanced top-and-bottom-line growth. Ms. Murthy brings a passion for developing & implementing strategies that drive both short-term and long-term value, acquired from extensive financial management experience in diverse industries. Ms. Murthy has successfully supported substantial acquisitions and overseen the development of capital structure and liquidity strategies.

- ***American Express***
  - Chief Financial Officer of Global Commercial Services; led strategic investment decisions and P+L stewardship (2016 to 2019)
  - Various other senior executive positions (2012 to 2016)
- ***Pepsico***
  - Various leadership positions leading high growth business units (1995 to 2012)

Other Current Directorships

- ***Avantor, Inc.***

Education

- Master's degree, Public & Private Management, Yale School of Management
- MBA, India Institute of Management
- Bachelor's degree, Computer Science & Engineering, Jadavpur University, India

**<u>Defendant Evans</u>**

35. Defendant Evans has served as a Company director since September 2023. He also currently serves as Chair of the Compensation Committee, a member of the Audit Committee and a member of the Executive Committee.

36. For the 2023 Fiscal Year, Defendant Evans received $264,692 in compensation from the Company. This included $14,694 in fees earned or paid in cash and $249,998 in stock awards.

37. The Company's 2024 Proxy Statement stated the following about Defendant Evans:

***J. Eric Evans – Chair of the Compensation Committee***
<u>Key Experience and Qualifications</u>

- Our Board concluded that Mr. Evans should serve as director because of his executive leadership experience and his extensive knowledge of the healthcare industry.

<u>Career Highlights</u>

- ***Teladoc, Inc.***
  - Independent Director (September 2023 to Present)
  - Member of the Compensation Committee (effective following the Annual Meeting: Compensation, **Chair**, Audit and Executive)
- ***Surgery Partners, Inc.*** *(a leading provider of surgical services)*
  - Chief Executive Officer and Director (2020 to Present)
  - Executive Vice President and Chief Operating Officer (2019 to 2020)

- ***Tenet Healthcare Corporation*** *(a diversified healthcare services company)*
  - President of Hospital Operations (2016 to 2018)
  - Chief Executive Officer of former Texas region (2015 to 2016)
- ***The Hospitals of Providence in El Paso***
  - Market Chief Executive Officer (2012 to 2015)

Other Current Public Company Boards

- ***Surgery Partners, Inc.***

Other Current Directorships and Engagements

- QuVa Pharma
- SPOON Foundation
- American Heart Association of Middle Tennessee
- Nashville Health Care Council

Education

- M.B.A., Harvard Business School
- Bachelor's degree in Industrial Management, Purdue University

**Defendant Fenwick**

38. Defendant Fenwick has served as a Company director since November 2020. She also serves as a member of the Nominating and Corporate Governance and Quality of Care and Patient Safety Committees. According to the 2024 Proxy Statement, as of March 28, 2024, Defendant Fenwick beneficially owned 40,432 shares of the Company's common stock. Given that the price of the Company's common stock at the close of trading on March 28, 2024, was $15.10 per share, Defendant Fenwick owned approximately $610,523 worth of Teladoc stock as of that date.

39. For the 2023 Fiscal Year, Defendant Fenwick received $280,002 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $225,002 in stock awards. For the 2022 Fiscal Year, Defendant Fenwick received $279,985 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $224,985 in stock awards.

40. The 2024 Proxy Statement stated the following about Defendant Fenwick:

***Sandra L. Fenwick***

Key Experience and Qualifications

- Our Board concluded that Mr. Fenwick should serve as director because of her executive leadership experience and her extensive knowledge of the healthcare industry.

Career Highlights

- ***Teladoc, Inc.***
  - Independent Director (November 2020 to Present)
  - Member of the Nominating and Corporate Governance and Quality of Care and Patient Safety Committee
- ***Boston Children's Hospital*** *(the nation's foremost independent pediatric hospital and the world's leading center of pediatric medical and health research)*
  - Chief Executive Officer, where she was a driving force to improve the effectiveness and efficacy of the care provided at Boston Children's, while at the same time reducing the cost of care (2013 to 2021)
  - President (2008 to 2013)
  - Chief Operating Officer (1999 to 2008)
  - Senior Vice President (1999)

Other Current Directorships and Engagements

- Harvard's Wyss Institute for Biologically Inspired Engineering, Inc.
- Risk Management Foundation of the Harvard Medical Institutions, Inc.
- Patient Discovery Solutions, Inc.
- BCH Foundation UK Limited
- Member, International Women's Forum/Massachusetts
- Member, Women Corporate Directors Boston

Prior Directorships

- Livongo Health, Inc. (2019 to the Teladoc/Livongo merger in 2020)

Education

- Ms. Fenwick has received numerous awards and honorary degrees for her contributions to healthcare.
- Master's in Public Health in Health Services Administration, University of Texas School of Public Health
- Bachelor's degree, with distinction, Simmons College

**Defendant Jacobson**

41. Defendant Jacobson has served as a Company director since February 2020. She also serves as the Audit Committee Financial Expert, as well as a member of the Quality of Care and Patient Safety Committee. According to the Company's 2024 Proxy Statement, as of March 28, 2024, Defendant Jacobson beneficially owned 10,566 shares of the Company's common stock. Given that the price of the Company's common stock at the close of trading on March 28, 2024

was $15.10 per share, Defendant Jacobson owned approximately $159,546 worth of Teladoc stock as of that date.

42. For the 2023 Fiscal Year, Defendant Jacobson received $280,002 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $225,002 in stock awards. For the 2022 Fiscal Year, Defendant Jacobson received $279,985 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $224,985 in stock awards.

43. The Company's 2024 Proxy Statement stated the following about Defendant Jacobson:

> ***Catherine A. Jacobson***
> <u>Key Experience and Qualifications</u>
> - Our Board has concluded that Ms. Jacobson should serve as director in view of her executive leadership experience and her extensive background in the healthcare industry.
>
> <u>Career Highlights</u>
> - ***Froedtert Thedacare Health*** *(a regional health care system based in Milwaukee, Wisconsin)*
>     - Chief Executive Officer and Director (2024 to present)
>     - President, Chief Executive Officer and Director (2012 to 2023)
>     - President (2011-2012)
>     - Executive Vice President of Finance and Strategy, Chief Financial Officer and Chief Strategy Officer (2010-2011)
> - ***Rush University Medical Center***
>     - Various executive leadership roles including CFO, treasurer, SVP of finance and strategic planning, marketing and communications (1988 to 2010)
>
> <u>Other Current Directorships and Engagements</u>
> - Chair, Vizient
> - Siebert Lutheran Foundation
> - Wisconsin Hospital Association
>
> <u>Prior Directorships</u>
> - United Way of Greater Milwaukee & Waukesha County (2012 to 2020)
> - Mercy Health (2014 to 2019)
> - Healthcare Financial Management Association (2004 to 2010)
> - Chair, Metropolitan Milwaukee Association of Commerce (2021 to 2022)
>
> <u>Recognitions</u>
> - Modern Healthcare, Top 25 Women Leaders (2021-2023)

- Modern Healthcare, 100 Most Influential People in Healthcare (2019 and 2023)
- Junior Achievement of Wisconsin, Distinguished Executives of the Year (2018) and induction into the Wisconsin Business Hall of Fame

Education

- Bachelor of Science in Accounting, Bradley University
- Honorary Degree—Doctor of Healthcare Leadership, University of Wisconsin- Milwaukee

**Defendant McKinley**

44. Defendant McKinley has served as a Company director since November 2009. He also serves as a member of the Compensation Committee and member of the Audit Committee. According to the 2024 Proxy Statement, as of March 28, 2024, Defendant McKinley beneficially owned 14,243 shares of the Company's common stock as of that date. Given that the price of the Company's common stock at the close of trading on March 28, 2024 was $15.10 per share, Defendant McKinley owned approximately $215,069 worth of Teladoc stock as of that date.

45. For the 2023 Fiscal Year, Defendant McKinley received $290,002 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $225,002 in stock awards. For the 2022 Fiscal Year, Defendant McKinley received $289,985 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $224,985 in stock awards.

46. The Company's 2024 Proxy Statement stated the following about Defendant McKinley:

***Thomas G. McKinley***

Key Experience and Qualifications

- Our Board has concluded that Mr. McKinley should serve as director in view of his significant director experience and his broad experience in the healthcare and technology industries.

Career Highlights

- ***Cardinal Partners*** *(a venture capital firm focused exclusively on healthcare investing)*
    - General Partner and West Coast Representative, with a focus in healthcare investment technology, technology-enabled services, AI, ML and blockchain in healthcare (2009 to present)

- ***Partech International*** *(a global venture capital firm with offices in U.S., Japan, Israel, and France)*
    - Co-Founder and Managing Partner focused on healthcare information technology sector (1982 to 2008)
- ***Prealize Health (formerly Cardinal Analytx)*** *(a project in conjunction with Professors Arnold Milstein and Nigam Shah at Stanford University)*
    - Founding CEO (2016 to 2018)
- ***OPALA*** *(a data automation partner that makes payer-provider collaboration radically easy)*
    - Founding CEO and helped spin out a team from Premera Blue Cross (2019 to 2021)

Other Current Directorships and Engagements

- Opala
- Chairman, Prealize Health

Prior Directorships

- Elected Director, Harvard Alumni Association (2001 to 2007)
- Sapphire Digital (2017 to 2021)

Education

- MBA, Stanford University, Graduate School of Business
- MS in Accounting, New York University, Stern School of Business
- AB in Economics, Harvard University

**Defendant Paulus**

47. Defendant Paulus has served as a Company director since February 2017. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Quality of Care and Patient Safety Committee and Executive Committee.

48. For the 2023 Fiscal Year, Defendant Paulus received $285,002 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $225,002 in stock awards. For the 2022 Fiscal Year, Defendant Paulus received $284,985 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $224,985 in stock awards.

49. The Company's 2024 Proxy Statement stated the following about Defendant Paulus:

> ***Kenneth H. Paulus – Chair of Nominating and Corporate Governance Committee***
> Key Experience and Qualifications

- Our Board has concluded that Mr. McKinley should serve as director because of his executive leadership experience in the healthcare industry.

Career Highlights

- ***Prime Therapeutics*** *(one of the nation's largest pharmacy benefit managers)*
  - President, Chief Executive Officer and Director (2019 to 2023)
- ***Alina Health*** **(**one of the nation's largest not-for-profit integrated delivery systems)
  - Various executive leadership roles including, President, Chief Executive Officer and Chief Operating Officer (2005 to 2014)
- ***Atrius Health System*** (one of the largest integrated physician organizations in New England and a teaching affiliate of Harvard Medical School)
  - President and Chief Executive Officer (2005 to 2009)
- ***Partners Community Healthcare***
  - Chief Operating Officer (1994 to 2000)

Other Current Directorships and Engagements

- Breg
- Gravie Health

Prior Directorships

- Cogentix Medical (2015 to 2016)
- Team Health (2015 to 2016)

Education

- Master of Healthcare Administration and Management, University of Minnesota
- BA in Biology, Augustana College

**Defendant Shedlarz**

50. Defendant Shedlarz has served as a Company director since September 2016. He also serves as an Audit Committee Financial Expert and member of the Compensation and Executive Committees. According to the Company's 2024 Proxy Statement, as of March 28, 2024, Defendant Shedlarz beneficially owned 4,979 shares of the Company's common stock. Given that the price of the Company's common stock at the close of trading on March 28, 2024 was $15.10 per share, Defendant Shedlarz owned approximately $75,183 worth of Teladoc stock as of that date.

51. For the 2023 Fiscal Year, Defendant Shedlarz received $294,494 in compensation from the Company. This included $69,492 in fees earned or paid in cash and $225,002 in stock

awards. For the 2022 Fiscal Year, Defendant Shedlarz received $289,985 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $224,985 in stock awards.

52. The Company's 2024 Proxy Statement stated the following about Defendant Shedlarz:

> ***David L. Shedlarz***
> Key Experience and Qualifications
> - Our Board concluded that Mr. Shedlarz should serve as director because of his deep experience in public company finance, his experience as a director of large public companies and his prior service as the chief financial officer of one of the world's leading pharmaceutical corporations.
>
> Career Highlights
> - ***Pfizer, Inc.,*** *(a pharmaceutical company)*
>   - Former Vice Chair (2005 to 2007)
>   - Executive Vice President and Chief Financial Officer having worldwide responsibility for Pfizer's former Medical Technology Group (1999 to 2005)
>   - Played a key role in shaping the strategic direction that contributed to Pfizer's impressive growth and helped establish it as an industry leader and innovator.
>
> Prior Directorships
> - Pitney Bowes, Inc. (2001 to 2023)
> - The Hershey Company (2008 to 2021)
> - TIAA (2007 to 2021)
>
> Education
> - MBA, Finance and Accounting, New York University, Leonard N. Stern School of Business
> - BS in Economics and Mathematics, Michigan State University-Oakland

**Defendant Smith**

53. Defendant Smith has served as a Company director since October 2018. He also serves as the Chair of the Quality of Care & Patient Safety Committee, and as a member of the Nominating and Corporate Governance and Executive Committees. According to the 2024 Proxy Statement, as of March 28, 2024, Defendant Smith beneficially owned 4,355 shares of the Company's common stock as of that date. Given that the price of the Company's common stock

at the close of trading on March 28, 2024, was $15.10 per share, Defendant Smith owned approximately $65,761 worth of Teladoc stock as of that date.

54. For the 2023 Fiscal Year, Defendant Smith received $282,997 in compensation from the Company. This included $57,995 in fees earned or paid in cash and $225,002 in stock awards. For the 2022 Fiscal Year, Defendant Smith received $279,985 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $224,985 in stock awards.

55. The Company's 2024 Proxy Statement stated the following about Defendant Smith:

> ***Mark Douglas Smith, M.D. – Chair of the Quality of Care & Patient Safety Committee***
>
> Key Experience and Qualifications
>
> - Our Board has concluded that Dr. Smith should serve as a director in view of his extensive background in the healthcare industry, including as a nationally recognized care delivery and health policy expert.
>
> Career Highlights
>
> - ***University of California at San Francisco***
>   - Clinical Professor of Medicine (1994 to present)
> - ***San Francisco General Hospital***
>   - Board-certified internist and maintains a clinical practice in HIV Care (1994 to present)
> - ***Guiding Committee of the Health Care Payment Learning and Action Network*** (a public-private partnership launched by the U.S. Department of Health and Human Services to promote the transition to value-based payment to improve care quality while lowering costs)
>   - Co-chair (2015 to 2019)
> - ***California Health Care Foundation (***an independently endowed philanthropy that works to improve healthcare access and quality for Californians)
>   - Founding President and Chief Executive Officer, helped build the foundation into a recognized leader in delivery system innovation, public reporting of care quality and applications of new technology in healthcare (1996 to 2013)
>
> Other Current Public Company Boards
>
> - Jazz Pharmaceuticals PLC
> - Phreesia, Inc.
>
> Other Current Directorships and Engagements
>
> - Commonwealth Fund
> - Editorial Board, Health Affairs
> - Prealize Health
>
> Education

- M.D., University of North Carolina at Chapel Hill
- MBA with a concentration in health care administration, Wharton School, University of Pennsylvania
- Bachelor's degree in Afro-American Studies, Harvard College

**Defendant Snow, Jr.**

56. Defendant Snow, Jr. has served as a Company director since February 2014. He also serves as the Chairman of the Board, Chair of the Executive Committee, and as a member of the Nominating and Corporate Governance and Compensation Committees. According to the 2024 Proxy Statement, as of March 28, 2024, Defendant Snow, Jr. beneficially owned 108,745 shares of the Company's common stock as of that date. Given that the price of the Company's common stock at the close of trading on March 28, 2024, was $15.10 per share, Defendant Smith owned approximately $1,642,050 worth of Teladoc stock as of that date.

57. For the 2023 Fiscal Year, Defendant Snow, Jr. received $332,502 in compensation from the Company. This included $107,500 in fees earned or paid in cash and $225,002 in stock awards. For the 2022 Fiscal Year, Defendant Snow, Jr. received $332,485 in compensation from the Company. This included $107,500 in fees earned or paid in cash and $224,985 in stock awards.

58. The Company's 2024 Proxy Statement stated the following about Defendant Snow, Jr.:

> ***David B. Snow, Jr. – Chairman of the Board & Chair of the Executive Committee***
> Key Experience and Qualifications
> - Our Board has concluded that Mr. Snow should serve as director because of his broad experience in the healthcare industry and his significant core business skills, including financial, operations and strategic planning.
>
> Career Highlights
> - ***Cedar Gate Technologies, Inc.***, (a provider of analytic and information technology services to providers, payers and self-insured employers entering risk-based/value-based care reimbursement arrangements)
>   - Chairman of the Board and Chief Executive Officer (2014 to present)
> - ***Medco Health Solutions, Inc.***, a leading pharmacy benefit manager
>   - Chairman and Chief Executive Officer (2003 to 2012)

  - Various leadership positions at WellChoice (Empire Blue Cross and Blue Shield) and Oxford Health Plans

Other Current Directorships

- Premise Health
- Chairman, Fuqua School of Business Board of Visitors at Duke University

Prior Directorships

- Pitney Bowes (2006 to 2019)
- CareCentrix (2014 to 2018)
- Medco Health Solutions, Inc. (2003 to 2012)

Education

- Master's in Health Care Administration, Duke University
- BS in Economics, Bates College

**Defendant Daniel**

59. Defendant Daniel previously served as a Company director from November 2020 until May 2024. During her service as a Company director, she also served as the Chair of the Audit Committee and as an Audit Committee Financial Expert. According to the 2024 Proxy Statement, as of March 28, 2024, Defendant Daniel beneficially owned 36,995 shares of the Company's common stock as of that date. Given that the price of the Company's common stock at the close of trading on March 28, 2024, was $15.10 per share, Defendant Daniel owned approximately $558,625 worth of Teladoc stock as of that date.

60. For the 2023 Fiscal Year, Defendant Daniel received $280,002 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $225,002 in stock awards. For the 2022 Fiscal Year, Defendant Daniel received $279,985 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $224,985 in stock awards

61. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Daniel made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 20, 2023 | 14,073 | $21.41 | $301,303 |

Thus, in total, before the fraud was exposed, she sold 14,073 shares of Company stock on inside information, for which she received approximately $301,303 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

62. The Company's 2023 Proxy Statement stated the following about Defendant Daniel:

> ***Karen L. Daniel***
> Key Experience and Qualifications
> - Our Board has concluded that Ms. Daniel should serve as a director because of her executive leadership experience and her extensive background in finance.
>
> Career Highlights
> - ***Black & Veatch*** (a global leader in providing engineering, consulting and construction services for energy, water and telecommunication sectors)
>   - Executive Director, Division President and Chief Financial Officer of the Global Finance and Technology Solutions division, among other positions, responsible for leading the company's global financial operations that included treasury, tax, accounting, financial reporting, budgeting and financial systems, and establishing corporate financial policies (1992 to 2018)
>   - Led Black & Veatch's global IT organization, which included oversight of systems, technology development and associated service providers
> - ***KPMG***
>   - Audit Professional rising to Senior Manager (1982 to 1992)
>
> Other Current Public Company Boards
> - Commerce Bancshares Inc.
> - Snap-On Incorporated
>
> Prior Directorships
> - Livongo Health, Inc. (2019 to the Teladoc/Livongo merger in 2020)
> - Blue Cross and Blue Shield of Kansas City (2017 to 2020)
> - Chair, Greater Kansas City Chamber of Commerce (2016 to 2017)
>
> Education
> - Master of Science in Accounting, University of Missouri-Kansas City
> - Bachelor of Science in Accounting, Northwest Missouri State University

**Defendant Frist**

63. Defendant Frist previously served as a Company director from September 2014 to May 2023. During his time with the Company, he also served as Chair of the Quality of Care & Patient Safety Committee and as a member of the Compensation and Executive Committees. According to the 2024 Proxy Statement, as of March 28, 2024, Defendant Frist beneficially owned 12,918 shares of the Company's common stock as of that date. Given that the price of the Company's common stock at the close of trading on March 28, 2024, was $15.10 per share, Defendant Frist owned approximately $195,061 worth of Teladoc stock as of that date.

64. For the 2023 Fiscal Year, Defendant Frist received $25,069 in compensation from the Company. This included $25,069 in fees earned or paid in cash. For the 2022 Fiscal Year, Defendant Frist received $287,485 in compensation from the Company. This included $62,500 in fees earned or paid in cash and $224,985 in stock awards.

65. The Company's Schedule 14A filed with the SEC on March 31, 2022 (the "2022 Proxy Statement") stated the following about Defendant Frist:

> ***William H. Frist, M.D.***
> <u>Key Experience and Qualifications</u>
> - Our Board has concluded that Dr. Frist should serve as director because of his significant public board director experience and his broad experience in the healthcare industry.
>
> <u>Career Highlights</u>
> - ***Cressey & Company*** (*a private investment firm focused exclusively on investing and building leading healthcare businesses)*
>   - Special Partner (2007 to Present)
>   - Current Chairman of the Cressey Distinguished Executive Council
> - ***Frist Cressey Ventures*** *(a venture capital firm specializing in healthcare investments)*
>   - Current Partner
> - ***Vanderbilt University***
>   - Current Adjunct Professor of Cardiac Surgery
> - ***U.S. Senate***
>   - Senator from Tennessee for 12 years, serving on both Finance and HELP committees, responsible for writing all health legislation
>   - U.S. Senate Majority Leader (2003 to 2007)
> - ***20 Years in Clinical Medicine***

- Founder of the Vanderbilt Multi-Organ Transplant Center
- Completed surgical training at Harvard's Massachusetts General Hospital and Stanford

Other Current Public Company Boards

- Select Medical Holdings Corporation

Other Current Directorships

- Aegis Sciences Corporation
- MDSave
- Devoted Health
- The Robert Wood Johnson Foundation
- The Nature Conservancy
- NashvilleHealth
- SCORE

Prior Directorships

- SmileDirectClub, Inc. (2010 to 2022)
- Accolade (2010 to 2021)
- GS Acquisition Holdings Corp II (2020 to 2021)
- AECOM (2014 to 2020)
- URS Corporation (2009 to 2014)
- Third National Bank (1990 to 1994)
- Princeton University (1974 to 1978 and 1991 to 2001)
- The Smithsonian Institution (1997 to 2006)

Education

- M.D., Harvard Medical School
- B.A., Princeton University

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

66. By reason of their positions as officers and/or directors of Teladoc and because of their ability to control the business and corporate affairs of Teladoc, the Individual Defendants owed Teladoc and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Teladoc in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Teladoc and its shareholders so as to benefit all shareholders equally.

67. Each director and officer of the Company owes to Teladoc and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

68. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Teladoc, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

69. To discharge their duties, the officers and directors of Teladoc were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

70. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Teladoc, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Teladoc's Board at all relevant times.

71. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

72. To discharge their duties, the officers and directors of Teladoc were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Teladoc were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Teladoc's own Code of Business Conduct and Ethics ("Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Teladoc conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Teladoc and procedures for the reporting of the business and

internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Teladoc's operations would comply with all applicable laws and Teladoc's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73. Each of the Individual Defendants further owed to Teladoc and the shareholders the duty of loyalty requiring that each favor Teladoc's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

74. At all times relevant hereto, the Individual Defendants were the agents of each other and of Teladoc and were at all times acting within the course and scope of such agency.

75. Because of their advisory, executive, managerial, and directorial positions with Teladoc, each of the Individual Defendants had access to adverse, non-public information about the Company.

76. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Teladoc.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

78. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

79. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Teladoc was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

80. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Teladoc and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS OF TELADOC

82. The Company's Code of Ethics applies to "all employees, board members, and other individuals authorized to act as representatives of Teladoc as well as vendor suppliers and independent contractors that do business with Teladoc." The Code of Ethics expresses that "Teladoc relies on each Employee to act in a manner utilizing good judgement, high ethical standards, and integrity in their business dealings on behalf of the Company."

83. At the outset, the Code of Ethics notes that it specifically applies to "all individuals who work for, or on behalf of, Teladoc, including directors and officers; full, part-time, and temporary employees; and independent contractors." Specifically, the Code of Ethics outlines the following overarching principles on which the Code is based on:

> ***We comply with laws, rules, and regulations***
>
> - We lead with integrity, accountability, and transparency and are committed to conducting our business affairs with honesty and in full compliance with all applicable laws, rules, and regulations wherever we conduct business around the world.
>
> ***We will not tolerate violation of any applicable laws by any Employee***

- Nor will Teladoc tolerate the disregard of Company policies or engaging in unethical dealings in connection with the Company's business.

***Loyalty to Teladoc***

- All Employees have a fiduciary duty to act in the best interests of Teladoc and to protect its assets, including its confidential information and trade secrets. We take appropriate steps to avoid a conflict of interest or the appearance of a conflict of interest. We do not participate, directly or indirectly, in any decision or action of Teladoc in which we would benefit personally.

***We respect each other and value succeeding together***

- Teladoc values the contributions of every Employee and strives to maintain a professional environment that is based on respect and tolerance. Diversity of our colleagues brings diversity of ideas, a more innovative work environment, and better solutions for our clients and members. Our policies are designed to ensure that Employees are treated, and treat each other, fairly and with respect and dignity. In keeping with this objective, conduct involving discrimination or harassment of others will not be tolerated.

***We treat third parties fairly and keep our promises***

- Outstanding customer service is a top priority at Teladoc. We strive to make every experience of customers, clients, members, and suppliers pleasant and fulfilling by treating them with honesty, respect, and dignity.

***We stand up for what's right and report compliance violations***

- We stand up for what's right. If you witness or hear about any practice that raises questions as to compliance with this Code, you must report it.

***Retaliation***

- Retaliation against anyone who reports on reasonable grounds a suspected violation of law or of Teladoc's policies or otherwise assists in a compliance investigation is a violation of the Code and will not be tolerated and appropriate discipline, up to and including termination of contract or employment (as applicable), will be taken.

84. Under the heading "Trading on Inside Information" the Code of Ethics states the following:

> Teladoc is a public company, which means using material, non-public Company information to trade in securities, or providing a family member, friend, or any other person with a "tip," is illegal. All such non-public information should be considered inside information and should never be used for personal gain. You are required to familiarize yourself and comply with Teladoc's Insider Trading Compliance Policy, copies of which are distributed to all Employees and are

> available from the Legal Department and available on Teladoc's intranet site. You should contact the Legal Department with any questions about your ability to buy or sell securities.

85. Under the heading, "Confidentiality and Privacy" the Code of Ethics states the following:

> When you began working at Teladoc, you agreed to maintain the confidentiality of Teladoc's "proprietary information." Proprietary information includes all non-public information that is maintained as confidential by the Company and that might be useful to competitors, investors, or that could be harmful to the Company, its customers, or its suppliers if disclosed to third parties. It includes, but it is not limited to business plans; research and new project plans; objectives and strategies; records; databases; customer, Employee, and supplier lists; and any unpublished financial or pricing information that is not available to the public.
>
> * * *
>
> Employees must also maintain confidentiality and not disclose to third parties any trade secrets of the Company as defined per applicable trade secret law.

86. Under the heading, "Business Practices and Standards" the Code of Ethics includes a subsection titled, "Accurate Reporting and Quality of Public Disclosures" where it states the following:

> The Company has a responsibility to provide full and accurate information in our public disclosures, in all material respects, about the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the U.S. Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely, and understandable disclosures. Teladoc's records must meet the highest standards of accuracy and completeness. You must make open and full disclosure to, and cooperate fully with, outside accountants in connection with any audit or review of Teladoc's financial statements.

87. Under the same heading, the Code of Ethics includes a separate subsection titled, "Protection of Company Assets" where it states the following:

> All Employees are expected to protect the Company's assets, ensure their efficient use, and use them with care and only for legitimate corporate purposes. This includes the protection of digital assets as well. Deleting or interfering with data while employed at Teladoc is not permitted. The sole purpose of the Company's equipment, vehicles, and supplies is the conduct of our business. Carelessness with,

> and waste or theft of, Company assets harms shareholder interests and should be reported. Loss, theft, and misuse of Company assets directly affects our profitability. Any suspected loss, misuse, or theft should be reported to the Legal Department.

88. Under the heading "Waivers and Amendments" the Code of Ethics states that:

> Any waivers of the provisions in this Code for executive officers or directors may only be granted by the Board of Directors and will be promptly disclosed to the Company's shareholders to the extent required by law or regulation. Any waivers of this Code for other Employees may only be granted by the Legal Department. Amendments to this Code must be approved by the Board of Directors and amendments of the provisions in this Code applicable to the CEO and the senior financial officers will also be promptly disclosed to the Company's shareholders to the extent required by law or regulation.

89. Under the heading "Compliance with this Code and Reporting of Illegal or Unethical Behavior" the Code of Ethics states that:

> This Code applies equally to every Employee. The Chief Compliance Officer has primary authority and responsibility for the enforcement of this Code, subject to the supervision of the Nominating and Corporate Governance Committee of the Board of Directors. Teladoc will devote the necessary resources to enable the Chief Compliance Officer to establish such procedures as may be reasonably necessary to create a culture of accountability and facilitate compliance with the Code. Compliance with laws, regulations, and Company policies is the responsibility of every single Employee. All Employees are expected to comply with both the letter and the spirit of this Code.

90. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, three of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Additionally, in violation of the Code of Ethics, the Individual Defendants failed to

maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## **TELADOC'S AUDIT COMMITTEE CHARTER**

91. The Company's Audit Committee Charter states that the Audit Committee's purpose is to "assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function and independent auditor."

92. Specifically, under the heading "Purpose," the Audit Committee Charter outlines the Audit Committee's responsibilities as follows:

> The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

93. The Charter outlines the duties and responsibilities of the Committee as follows:

> ***A. Interaction with the Independent Auditor.***
>
> 1. *Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules
>
> 2. *Annual Report on Independence and Quality Control.* The Committee must, at least annually, obtain and review a report from the independent auditor

describing (a) the auditing firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review or peer review of the auditing firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years relating to any independent audit conducted by the auditing firm, and any steps taken to deal with any such issues; and (c) all relationships and services between the independent auditor and the Company in order to assess the independent auditors' independence.

* * *

**B. _Annual Financial Statements and Annual Audit_**

1. *Audit Problems.* The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

2. *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

3. *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

* * *

***C. Quarterly Financial Statements***

1. *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

***D. Other Duties and Responsibilities***

1. *Review of Earnings Releases.* The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

2. *Risk Assessment and Risk Management*. The Committee must discuss the Company's policies with respect to risk assessment and risk management. The Committee must review and oversee the Company's compliance with risk management policies and procedures, including, but not limited to, the Code of Business Conduct and Ethics, and, in

particular, with respect to cybersecurity, IT and data protection and compliance with applicable laws and rules concerning privacy.

3. *Reports to the Board of Directors.* The Committee must report regularly to the Board regarding the activities of the Committee.

4. *Committee Self-Evaluation.* The Committee must at least annually perform an evaluation of the performance of the Committee.

5. *Review of this Charter.* The Committee must periodically review and reassess this Charter and submit any recommended changes to the Board for its consideration.

94. In violation of the Audit Committee Charter, Defendant Shedlarz (as committee Chair and Audit Committee Financial Expert) and Defendants Jacobson and Daniel (as Audit Committee Financial Experts and committee members) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Shedlarz, Jacobson, and Daniel failed to maintain the accuracy of Company records and reports, failed to comply with laws and regulations, failed to act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and failed to properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

95. Teladoc is a virtual health service provider dedicated to "making virtual care the first step on any healthcare journey by delivering, enabling, and empowering integrated whole person virtual care services and experiences that span every stage of the healthcare journey."

96. The Company has two reportable segments including: Teladoc Health Integrated Care and BetterHelp. BetterHelp is one of Teladoc's main health services which provides a virtual mental health counseling platform for the Company's users. Additional health services provided by BetterHelp include online primary care services geared towards chronic disease management.

97. The financial results of Q1-2024 indicated that BetterHelp is Teladoc's largest division and provider of online mental health counseling, reaching 420,000 paying users.

98. Additionally, by contributing about 42% of the Company's overall revenue, BetterHelp's business has made it the biggest contributor to the Company's revenue.

99. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Teladoc, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) despite public representations that Teladoc would reduce BetterHelp's spending on advertising and overall marketing, Teladoc actually increased BetterHelp's marketing budget throughout the 2023 Fiscal Year; (ii) the increase in spending on marketing BetterHelp had a severely negative impact on Teladoc's revenue; (iii) BetterHelp's membership figures plateaued and then fell in the 2023 Fiscal Year as a result of market saturation largely brought on by BetterHelp's own extensive advertising and marketing; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

100. Additionally, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain internal controls while three of the Individual Defendants engaged in lucrative insider trading, reaping personal profits ***reaching almost $2 million.***

**<u>False and Misleading Statements</u>**

***November 2, 2022 Q3-2022 10-Q***

101. According to the Form 10-Q the Company filed with the SEC on November 2, 2022 for the quarterly period ended September 30, 2022 (the "Q3-2022 10-Q"), the Company incurred a 61% increase in advertising and marketing spending in 2022 compared to the same quarter in 2021. For the third quarter of 2021, Teladoc spent $111.08 million on advertising and marketing. For the third quarter of 2022, the Company spent a total of $178.92 million on advertising and marketing. The Q3-2022 10-Q attributed this significant increase to "higher digital and media advertising costs related to BetterHelp."

***November 30, 2022 Piper Sandler Annual Healthcare Conference***

102. During the Piper Sandler Annual Healthcare Conference (the "Conference") held on November 30, 2022, Teladoc's CFO, Defendant Murthy mentioned the Company's plan to pull back on advertising and marketing spending, stating:

> I think about how we are run rating and exiting, I'll say a couple of things. One is, we have talked about the ad spending primarily around the BetterHelp business, moderating in 4Q, right? We've talked about that extensively.
>
> And as a reminder, it's essentially going back to the way life was for BetterHelp pre-Covid, right? The ad spending dynamics in – as we approach the holiday season are certainly more expensive and challenging and this is a business where we do a lot of optimization around both within different advertising channels and across the different advertising channels.
>
> So it makes sense for us to essentially pull back when we find the ROIs for the ad spend to be suboptimal. And so what we've talked about is to expect A&M to sequentially decline in 4Q very similar to what it used to be. I would say the last 2 years have essentially been an anomaly away from a normal seasonal pattern.

103. Defendant Murthy went on to explain,

> [i]f you think about how we do our ad spending in that, we can choose where on the efficiency curve, we want to be as we balance growth and profit, right? We could decide we want to invest more in ad spend, but that last dollar will be marginally more inefficient relative to the first dollar of ad spent. But we'll get more revenue growth out of that.

104. Defendant Murthy further described the Company's plans to pull back advertising and marketing spending, stating:

> It is a sequential pullback in ad spend. And we've talked about how that is essentially returning to normal seasonal dynamics. If you actually harken back to 2019 and look at A&M as a percentage of revenue, it declined from 3Q to 4Q by something like 650 basis points.
>
> So my point being that what we have now talked about a pullback in ad spend is returning to essentially the way it used to be pre-Covid and that is one of the important drivers of the full year adjusted EBITDA that we have guided to, that's actually a large part of what it is.
>
> I will also say just because we are pulling back in ad spend does not mean that we are not spending are not spending at all, right? Like it's not that we are going dark, far from that. So, we continue to have ad spend in the BetterHelp business, and we are essentially looking to the ad prices and deciding where we want to be.

105. Defendant Gorevic later weighed in on the Company's advertising spending at the Conference. Specifically, he spoke about "doing more in larger media sort of mass media outlets. And some of that's just in response to the fact that the price of advertising in those mass media channels has come down."

106. Analysts positively responded to the statements made during the Conference, including Jessica Tassan, a Piper Sandler analyst, who projected that BetterHelp could grow "36% globally in 2022" and "low 20% global BetterHelp growth y/y" in 2023.

***February 22, 2023 Investor Presentation***

107. On February 22, 2023, the Company held an investor presentation where it presented its membership figures for the first time. During the presentation, Teladoc reported that the Company's memberships had consistently increased from the first quarter of 2022 to the first quarter of 2023. In the first quarter of 2022, BetterHelp had 382,000 members; in the second quarter of 2022 BetterHelp had 408,000 members; in the third quarter of 2022 BetterHelp had 437,000 members; in the fourth quarter of 2022 BetterHelp's memberships increased to 450,000; and in the first quarter of 2023, memberships increased to 467,000.

***February 22, 2023, Earnings Call***

108. During an earnings call held on February 22, 2023, analyst Jack A. Senft from William Blair inquired into the potential growth in BetterHelp memberships. In response, Defendant Murthy acknowledged that although growth may not continue to accelerate at the rate it did initially:

> There remains a long runway for growth in this market. If you think about virtual therapy, it's still underpenetrated, and a lot of the structural issues are on access and costs aren't getting addressed in other places. So, the tailwinds for this business are still very strong.

***April 11, 2023 Proxy Statement***

109. Teladoc filed the 2023 Proxy Statement on April 11, 2023. Defendants Gorevic, Murthy, Fenwick, Jacobson, McKinley, Paulus, Shedlarz, Smith, Snow, Jr., Daniel, and Frist solicited the 2023 Proxy Statement. The 2023 Proxy Statement was filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

110. The 2023 Proxy Statement called for shareholder approval of, *inter alia*: (i) the reelection of Defendants Daniel, Fenwick, Gorevic, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow, Jr. to the Board; (ii) the Company's named executive officers' compensation on a non-

binding advisory basis; (iii) the Teladoc, Inc. 2023 Incentive Award Plan (the "2023 Incentive Award Plan"); and (iv) an amendment to the Teladoc, Inc. 2015 Employee Stock Purchase Plan.

111. As noted above, the 2023 Proxy Statement solicited shareholder approval of the 2023 Incentive Award Plan which called for the issuance of 8,250,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the 2023 Incentive Award Plan who would not have approved the 2023 Incentive Award Plan had they been informed of the true financial state of the Company and the wrongdoing alleged herein. According to the 2023 Proxy Statement, the 2023 Incentive Award Plan's purpose "is to enhance the Company's ability to attract, retain and motivate persons who make (or are expected to make) important contributions to the Company by providing these individuals with equity ownership opportunities."

112. The 2023 Incentive Award Plan authorized the issuance of incentive stock options ("ISOs"), among other types of stock. Specifically, under the sub-heading "Number of Shares Authorized" within the "Summary of the 2023 Incentive Award Plan Section," the confines of such limits are defined as:

> The 2023 Incentive Award Plan ***provides for an aggregate of 8,250,000 shares of our common stock, plus the number of shares remaining available for future grant under the Prior Plans as of the effective date of the 2023 Incentive Award Plan*** and the number of shares of our common stock issued under any of the Prior Plans as of the effective date that is thereafter forfeited, canceled, expires, terminates, otherwise lapses or is settled in cash, in whole or in part, without the delivery of shares of our common stock to be available for awards under the 2023 Incentive Award Plan. ***No more than 8,250,000 shares of our common stock may be issued with respect to incentive stock options under the 2023 Incentive Award Plan.***
>
> ***No non-employee director may be granted awards having an aggregate maximum value at the date of grant, together with any cash fees payable to such non-employee director, in excess of $650,000,*** except in extraordinary circumstances as determined by the Compensation Committee. Shares of our common stock subject to awards are generally unavailable for future grant unless such awards are

> subsequently terminated, canceled or forfeited without the participant having benefited therefrom; provided that, in no event shall shares used in payment of the exercise price or strike price of an award or any taxes required to be withheld in respect of an award, shares subject to SARs that are not issued in connection with the stock settlement of the SAR on exercise thereof and shares purchased by the Company on the open market with the cash proceeds from the exercise of options increase the number of shares of our common stock that may be granted under the 2023 Incentive Award Plan. If there is any change in our corporate capitalization (as discussed below), the Compensation Committee, in its sole discretion, may make substitutions or adjustments to (i) the number of shares reserved for issuance under the 2023 Incentive Award Plan, (ii) the number of shares covered by awards then outstanding under the 2023 Incentive Award Plan, (iii) the limitations on awards under the 2023 Incentive Award Plan, (iv) the exercise price or strike price of outstanding options or SARs, respectively, and (v) such other equitable substitution or adjustments as it may determine appropriate.

(Emphasis added.)

113. Note that under the 2023 Incentive Award Plan, "No non-employee director may be granted awards having an aggregate maximum value at the date of grant, together with any cash fees payable to such non-employee director, in excess of $650,000, except in extraordinary circumstances as determined by the Compensation Committee." Defendants Gorevic, Murthy, Fenwick, Jacobson, McKinley, Paulus, Shedlarz, Smith, Snow, Jr., Daniel, and Frist are all eligible to receive stock awards under the 2023 Incentive Award Plan, have all already received various amounts of stock awards under the 2023 Incentive Award Plan, and will receive material amounts of stock awards under the 2023 Incentive Award Plan in the future, thereby materially benefitting from the adoption of the 2023 Incentive Award Plan.

114. The 2023 Proxy Statement also represented, in relevant part:

> [A]s of March 31, 2023, we had 6,278,157 shares available for grant. The number of shares being requested for authorization under the 2023 Incentive Award Plan is 8,250,000 shares, which we expect to use for future equity grants over approximately the next one year. If the 2023 Incentive Plan is approved by our stockholders, we will have, in the aggregate, approximately 14,528,157 shares, which includes the number of shares remaining available for future grant under the Prior Plans as of March 31, 2023, available for issuance to all eligible participants under the 2023 Incentive Award Plan, plus any shares forfeited under Prior Plans

> following the effective date of the 2023 Incentive Award Plan. If the 2023 Incentive Award Plan is not approved by our stockholders, we will continue to grant equity incentive awards under the Prior Plans until each of the Prior Plans expire or there is no remaining capacity under such plans, and it may become necessary to increase cash compensation to replace any shortfall in available equity, which we do not believe is advisable or in stockholders' best interests. If the 2023 Incentive Award Plan is approved, the Prior Plans will be shut down and no further grants will be made under the Prior Plans.

115. Regarding the Company's Code of Ethics, the 2023 Proxy Statement provided, in relevant part:

> Our Board has adopted a Code of Business Conduct and Ethics applicable to directors, officers and employees that outlines our corporate values and standards of integrity and behavior and is designed to foster a culture of honesty and accountability, drive compliance with legal and regulatory requirements, protect and promote our reputation, as well as the preparation and maintenance of our financial and accounting information. Our Board has also adopted Corporate Governance Guidelines to assist it in the exercise of its responsibilities.
>
> Our Chief Compliance Officer has responsibility to implement and maintain an effective ethics and compliance program and is responsible to provide updates on that program to the Nominating and Corporate Governance Committee. The Code of Business Conduct and Ethics and the Corporate Governance Guidelines are reviewed annually and periodically amended as the Board enhances our corporate governance practices and programs.
>
> We intend to satisfy the disclosure requirements under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), regarding any amendment to, or waiver from a material provision of our Code of Business Conduct and Ethics involving our principal executive, financial or accounting officer or controller by posting such information on our website. The Corporate Governance Guidelines and Code of Business Conduct and Ethics are available on our website at ir.teladochealth.com by clicking through "Corporate Governance."

116. Regarding the Board's role in "Risk Oversight," the 2023 Proxy Statement provided, in relevant part:

> The Board believes that evaluating our executive team's management of the risks confronting the Company is one of its most important areas of oversight. The Board further believes that taking an active role in the oversight of the Company's corporate strategy and the related risks is appropriate, given our Board members' combined breadth and depth of experience, and is critical to ensuring that the long-term interests of the Company and its stockholders are being served. The Board

> also encourages management to promote a culture that actively manages risks as a part of the Company's corporate strategy and day-to-day business operations. The Board administers its risk oversight function both directly and through its committees. For risks that fall within a committee's areas of primary responsibility and expertise, the Board assigns oversight to that committee, which then also apprises the full Board of significant matters and management's response. The full Board directly oversees overall corporate risk and strategy and other matters that do not fall within the responsibility of a particular committee.

117. Regarding the Audit Committee's responsibilities, the 2023 Proxy Statement provided, in relevant part:

> The Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of:
>
> - Financial reporting
> - Internal controls over financial reporting
> - Cybersecurity
> - Compliance with legal and regulatory requirements
>
> The Audit Committee regularly discusses risk assessment and risk management policies with management and our independent auditors, including our major risk exposures, such as cybersecurity, data privacy, and environmental and social concerns, their potential financial impact on our organization and the steps we take to mitigate and manage these risks, including financial reporting that encompasses disclosure controls and procedures.
>
> The Audit Committee regularly reviews the Company's key risks, risk mitigation strategies, and available related risk mitigation metrics that are identified by our enterprise risk management ("ERM") program. The committee solicits input from directors on the steps taken to mitigate risks and plans for additional mitigation going forward. Our head of internal audit also reports to the Chairman of the Audit Committee.
>
> - The Audit Committee assists the Board with oversight of risk management by:
> - reviewing the Company's financial statements and Company's quarterly and annual reports filed with the SEC, including the risk factors disclosed therein

- meeting with our independent auditors at regularly scheduled meetings of the Audit Committee to review their reports on the adequacy and effectiveness of our disclosure and internal controls
- discussing with management our major financial risks and exposures and the steps management has taken to mitigate, monitor and control any risks and exposures

118. Defendants Gorevic, Murthy, Fenwick, Jacobson, McKinley, Paulus, Shedlarz, Smith, Snow, Jr., and Frist caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (i) despite public representations that Teladoc would reduce BetterHelp's spending on advertising and overall marketing, Teladoc actually increased BetterHelp's marketing budget throughout the 2023 Fiscal Year; (ii) the increase in spending on marketing BetterHelp had a severely negative impact on Teladoc's revenue; (iii) BetterHelp's membership figures plateaued and then fell in the 2023 Fiscal Year as a result of market saturation largely brought on by BetterHelp's own extensive advertising and marketing; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

119. The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Ethics was not followed, as the Individual Defendants violated the Code of Ethics, including by allowing false and misleading statements to be issued to the investing public.

120. As a result of Defendants Gorevic, Murthy, Fenwick, Jacobson, McKinley, Paulus, Shedlarz, Smith, Snow, Jr., and Frist causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Daniel, Fenwick, Gorevic, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow, Jr. to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) approve the Company's executive

officers' compensation, on an advisory basis; (3) approve the 2023 Incentive Award Plan; and (4) to approve an amendment to the Teladoc, Inc. 2015 Employee Stock Purchase Plan.

121. The statements referenced in ¶¶ 101-108 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company continuously increased its advertising and marketing spend throughout 2023, even though it previously assured the investing public that it would cut back on marketing expenses; (2) the Company's revenue was negatively impacted by the increased marketing budget for BetterHelp, which provided little return; and (3) although market saturation caused by the Company's increase in marketing and advertising spend rendered such expansion ineffectual, the Company continued to increase spending for BetterHelp. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

## **The Truth Emerges**

***February 20, 2024 8-K and Associated Press Release***

122. Following the market close on February 20, 2024, Teladoc announced its Q4-2023 earnings in the February 2024 8-K containing a press release.

***February 20, 2024 Q4-2023 Earnings Call and Investor Presentation***

123. That same day, the Company held its Q4-2023 Earnings Call and associated investor presentation (the "Q4-2023 Investor Presentation"), where it disclosed that BetterHelp's quarterly revenue fell short $1 million compared to 4Q-2022. The presentation further revealed that BetterHelp experienced a loss of $10 million from its third quarter in 2023 to its fourth quarter in 2023. This marked BetterHelp's second consecutive sequential loss.

124. Additionally, the investor presentation revealed a decrease in memberships for BetterHelp throughout 2023. While BetterHelp membership continued to increase from the first quarter of 2023 to the second quarter of 2023, rising from 467,000 members in 1Q-2023 to 476,000 in 2Q-2023, membership growth significantly decreased thereafter. In 3Q-2023 BetterHelp had 459,000 memberships and in 4Q-2023 BetterHelp memberships came in at 425,000, in spite of increased spending on advertising and marketing.

125. Throughout the question-and-answer session of the presentation, Barclays analyst Stephanie July Davis asked for a revenue forecast for BetterHelp's future, since it had fallen short of expectations. In his response, Defendant Gorevic described the reason for the lower-than-anticipated revenue, stating:

> What drove that was weaker customer acquisition trends in the second half of the year. There are a bunch of factors that go into that. In particular, we saw pressure on our customer acquisition costs in social media channels. We're fortunate, I guess, the good part is, we have a diversified set of channels and the higher overall spend levels as we get to higher levels, the more we press on sort of across of those channels. So we felt the impact of that in the second half of the year.

126. Defendant Murthy went on to admit:

> [I]f you sort of take a step back and just think about the BetterHelp business, what I would also say is, with our increased focus of – on profitable growth, our – the BetterHelp business new member acquisition is somewhat gated by the amount of capital we can deploy at what we would consider to be acceptable rates of return during any given period. So what that means is that the growth in BetterHelp is in part dependent on our ability to efficiently reach new individuals to create awareness for BetterHelp's products and services. So it is both, I would say, the cost per acquisition trends that we are seeing that we have factored into our business –into our guidance and a continuing theme of how we are balancing top line growth with profitability in this business.

127. The disappointing financial results of the Company's earnings report and membership numbers caused negative reactions from analysts. Analyst George Hill of Deutsche Bank observed that "the business [is] seeming to veer off course with membership down two

quarters in a row and with lower yields on marketing spend which are anticipated to persist through 1H of 2024."

128. Analyst at Davidson, Gil Luria also expressed doubt in the Company's current strategy stating, "in BetterHelp we expect -1% user growth and slightly negative ARPU in a business that is proving difficult to grow with existing marketing dollars and strategies."

129. On this news, the Company's common stock share price fell rapidly overnight—from a closing price of $20.49 per share on February 20, 2023 to a closing price of $15.64 on February 21, 2023—representing a decrease of approximately ***24%*** in value, or $4.85 per share.

***February 23, 2024 Form 10-K***

130. The Company's 2023 Form 10-K, filed on February 23, 2024, revealed a significant increase of $65.3 million in advertising costs made in 2023. From 2021 to 2023, Teladoc increased its advertising and marketing spend over $250 million with advertising costs coming in at $416.7 million in 2021; $623.5 million in 2022, and $668.8 million in 2023.

131. The 2023 10-K disclosed the reason for the significant increase, stating "[t]his increase was substantially driven by higher digital and medial advertising costs related to BetterHelp."

132. Defendant Gorevic agreed, stating "revenue and margins were below our expectations in the quarter as we saw lower yields on marketing spend."

133. Defendant Murphy echoed this, explaining that BetterHelp's "[r]evenue was $276 million in the fourth quarter, roughly flat versus the prior year and down 3% sequentially."

## DAMAGES TO TELADOC

134. As a direct and proximate result of the Individual Defendants' conduct, Teladoc has lost and expended, and will continue to lose and expend, many millions of dollars.

135. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

137. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

138. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

139. As a direct and proximate result of the Individual Defendants' conduct, Teladoc has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

140. Plaintiff brings this action derivatively and for the benefit of Teladoc to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Teladoc, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

141. Teladoc is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142. Plaintiff is, and has been at all relevant times, a shareholder of Teladoc. Plaintiff will adequately and fairly represent the interests of Teladoc in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

143. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

144. A pre-suit demand on the Board of Teladoc is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Evans, Fenwick, Jacobson, McKinley, Paulus, Shedlarz, Smith and Snow, Jr. (the "Director-Defendants"), and non-party Charles Divita, III (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

145. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially

investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

146. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

147. As Board members of Teladoc charged with overseeing the Company's affairs, all of the Director-Defendants must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Teladoc, the Director-Defendants must have been aware of the risks associated with continuing to increase advertising and marketing spend for BetterHelp while assuring the investing public that it would not, including potential revenue and membership downfalls.

148. Additional reasons that demand on Defendant Evans is futile follow. Defendant Evans has served as a Company director since September 2023. He receives handsome compensation for his role at the Company, including $264,692 in 2023 and $279,985 in 2022. As a trusted Company director, he failed to conduct sufficient oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, under the 2023 Incentive Award Plan, Defendant Evans is eligible to receive stock awards under the 2023 Incentive Award Plan, has

received various amounts of stock awards under the 2023 Incentive Award Plan, and will receive material amounts of stock awards under the 2023 Incentive Award Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Award Plan. For these reasons Defendant Evans breached his fiduciary duties and faces a substantial likelihood of liability. As such, demand upon him is futile and, therefore, excused.

149. Additional reasons that demand on Defendant Fenwick is futile follow. Defendant Fenwick has served as a Company director since November 2020. She also serves as a member of the Nominating and Corporate Governance Committee. She receives handsome compensation for her role at the Company, including $264,692 in 2023 and $279,985 in 2022. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Further, Defendant Fenwick solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of herself and Defendants Daniel, Gorevic, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow, Jr. Moreover, under the 2023 Incentive Award Plan, Defendant Fenwick is eligible to receive stock awards under the 2023 Incentive Award Plan, has received various amounts of stock awards under the 2023 Incentive Award Plan, and will receive material amounts of stock awards under the 2023 Incentive Award Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Award Plan. For these reasons, Defendant Fenwick breached her fiduciary duties, faces a substantial likelihood of liability and thus demand upon her is futile and, therefore, excused.

150. Additional reasons that demand on Defendant Jacobson is futile follow. Defendant Jacobson has served as a Company director since February 2020. She also serves as the Audit

Committee Financial Expert and member of the Audit Committee. She receives handsome compensation for her role at the Company, including $280,002 in 2023 and $279,985 in 2022. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As an Audit Committee Financial Expert, Defendant Jacobson further breacher her heightened fiduciary duties to assist the Board in monitoring the Company's financial reporting process and related matters. Further, Defendant Jacobson solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of herself and Defendants Daniel, Fenwick, Gorevic, McKinley, Paulus, Shedlarz, Smith, and Snow, Jr., allowing them to continue to breach their fiduciary duties. Moreover, under the 2023 Incentive Award Plan, Defendant Jacobson is eligible to receive stock awards under the 2023 Incentive Award Plan, has received various amounts of stock awards under the 2023 Incentive Award Plan, and will receive material amounts of stock awards under the 2023 Incentive Award Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Award Plan. For these reasons, Defendant Jacobson breached her fiduciary duties, faces a substantial likelihood of liability, and thus demand upon her is futile and, therefore, excused.

151. Additional reasons that demand on Defendant McKinley is futile follow. Defendant McKinley has served as a Company director since 2009. He also serves as the Chair for the Compensation committee and a member of the Executive Committee. He receives handsome compensation for his role at the Company, including $290,002 in 2023 and $289,985 in 2022. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his

duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant McKinley solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of Defendants Jacobson, Daniel, Fenwick, Gorevic, Paulus, Shedlarz, Smith, and Snow, Jr., allowing them to continue to breach their fiduciary duties. Moreover, Defendant McKinley materially benefited from the approval of the 2023 Incentive Award Plan by receiving $225,002 in stock awards during Fiscal Year 2023. For these reasons, too, Defendant McKinley breached his fiduciary duties, faces a substantial likelihood of liability and thus demand upon him is futile and, therefore, excused.

152. Additional reasons that demand on Defendant Shedlarz is futile follow. Defendant Shedlarz has served as a Company director since September 2016. He also serves as an Audit Committee Financial Expert and member of both the Compensation and Executive Committees. In addition, Defendant Shedlarz receives handsome compensation for his role at the Company, including $294,494 in 2023 and $289,985 in 2022. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As Audit Committee Financial Expert, Defendant Shedlarz neglected her greater responsibility to assist the Board in monitoring the Company's financial reporting process and related matters. Further, Defendant Shedlarz solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of himself and Defendants Daniel, Fenwick, Gorevic, Jacobson, McKinley, Paulus, Smith, and Snow, Jr., allowing them to continue to breach their fiduciary duties. Moreover, under the 2023 Incentive Award Plan, Defendant

Shedlarz is eligible to receive stock awards under the 2023 Incentive Award Plan, has received various amounts of stock awards under the 2023 Incentive Award Plan, and will receive material amounts of stock awards under the 2023 Incentive Award Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Award Plan. For these reasons, Defendant Shedlarz breached his fiduciary duties, faces a substantial likelihood of liability and thus demand upon him is futile and, therefore, excused.

153. Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since October 2018. He also serves as the Chair of the Nominating and Corporate Governance Committee and member of the Nominating and Corporate Governance and Executive Committees. He receives handsome compensation for his role at the Company, including $282,997 in 2023 and $279,985 in 2022. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Smith solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of himself and Defendants Daniel, Fenwick, Gorevic, Jacobson, McKinley, Paulus, Shedlarz, and Snow, Jr. allowing them to continue to breach their fiduciary duties. Moreover, under the 2023 Incentive Award Plan, Defendant Smith is eligible to receive stock awards under the 2023 Incentive Award Plan, has received various amounts of stock awards under the 2023 Incentive Award Plan, and will receive material amounts of stock awards under the 2023 Incentive Award Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Award Plan. For these reasons,

Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, and thus demand upon him is futile and, therefore, excused.

154. Additional reasons that demand on Defendant Snow, Jr. is futile follow. Defendant Snow, Jr. has served as a Company director since February 2014. He also serves as the Chairman of the Board, Chair of the Executive Committee, and member of the Nominating and Corporate Governance and Compensation Committees. He receives handsome compensation for his role at the Company, including $332,502 in 2023 and $279,985 in 2022. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Snow, Jr. solicited the 2023 Proxy Statement, which contained material misrepresentations and omissions that led to the re-election of himself and Defendants Daniel, Fenwick, Gorevic, Jacobson, McKinley, Paulus, Shedlarz, and Smith allowing them to continue to breach their fiduciary duties. Moreover, under the 2023 Incentive Award Plan, Defendant Snow Jr., is eligible to receive stock awards under the 2023 Incentive Award Plan, has received various amounts of stock awards under the 2023 Incentive Award Plan, and will receive material amounts of stock awards under the 2023 Incentive Award Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Award Plan. For these reasons, Defendant Snow, Jr. breached his fiduciary duties, faces a substantial likelihood of liability, and thus demand upon him is futile and, therefore, excused.

155. Additional reasons that demand on the Board is futile follow.

156. Defendants Shedlarz (as Chair and Audit Committee Financial Expert) and Jacobson (as Audit Committee Financial Expert) served as members of the Audit Committee at all

relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

157. Defendants McKinley (as Chair), Snow, Jr., and Smith (the "Compensation Committee Defendants") served as members of the Compensation Committee at all relevant times. As such, they were responsible for determining the compensation of the Company's officers and directors, including the Director-Defendants through the implementation of the 2023 Incentive Award Plan that was approved by the Company's shareholders, as a result of the Director-Defendants soliciting the 2023 Proxy Statement which contained false and misleading statements and omitted material facts. In particular, the Compensation Committee Defendants ensured that certain Individual Defendants were motivated to issue false and misleading statements and to artificially inflate the growth and overall performance of the Company by awarding the Individual Defendants' compensation—through stock awards issued under the 2023 Incentive Award Plan. In the 2023 Fiscal Year, the Compensation Committee Defendants provided personal benefits to all of the Director-Defendants in the form of stock awards issued pursuant to the 2023 Inventive

Award Plan while the Director-Defendants were breaching their fiduciary duties to the Company. Under the 2023 Incentive Award Plan, the Compensation Committee Defendants are eligible to receive stock awards under the 2023 Incentive Award Plan, have received various amounts of stock awards under the 2023 Incentive Award Plan, and will receive material amounts of stock awards under the 2023 Incentive Award Plan in the future, thereby materially benefiting from the adoption of the 2023 Incentive Award Plan.

158. Specifically, Defendants Evans, Fenwick, Jacobson, McKinley, Paulus, Shedlarz, Smith, Snow, Jr., Daniel, and Frist received $249,998, $225,002, $225,002, $225,002, $225,002, $225,002, $225,002, $225, 002, $225,002, and $225,002 respectively, in stock awards pursuant to the 2023 Incentive Award Plan for the 2023 Fiscal Year.

159. All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

160. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest,

conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and the Company's insider trading policy. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

161. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

162. The acts complained of herein constitute violations of fiduciary duties owed by Teladoc's officers and directors, and these acts are incapable of ratification.

163. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Teladoc. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Teladoc, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance

coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

164. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Teladoc to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

165. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

166. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

168. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

169. Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose that: (i) despite public representations that Teladoc would reduce BetterHelp's spending on advertising and overall marketing, Teladoc actually increased BetterHelp's marketing budget throughout the 2023 Fiscal Year; (ii) the increase in spending on marketing BetterHelp had a severely negative impact on Teladoc's revenue; (iii) BetterHelp's membership figures plateaued and then fell in the 2023 Fiscal Year as a result of market saturation largely brought on by BetterHelp's own extensive advertising and marketing; and (iv) the Company failed to maintain internal controls. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

170. Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

171. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination

in the 2023 Proxy Statement, including the election of directors, the approval of the 2023 Incentive Award Plan, and the ratification of the appointment of an independent registered public accounting firm.

172. As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted, *inter alia*, to re-elect and Defendants Daniel, Gorevic, Jacobson, McKinley, Paulus, Shedlarz, Smith, and Snow, Jr.to the Board, thus allowing them to continue breaching their fiduciary duties to Teladoc and to approve the 2023 Incentive Award Plan, which the Individual Defendants have personally benefited from.

173. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

174. Plaintiff, on behalf of Teladoc has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

175. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Teladoc's business and affairs.

177. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

178. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Teladoc, Inc.

179. In breach of their fiduciary duties owed to Teladoc, Inc., the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that(1) despite public assurances that it would pull back advertising spending, the Company would continue to expand its marketing budget throughout 2023, especially in the BetterHelp business; (2) increased marketing spend on BetterHelp deteriorated the Company's revenue; (3) BetterHelp membership plateaued and then decreased in 2023 as a result of the market saturation. Largely due to BetterHelp's own marketing. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

180. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

181. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

182. In yet further breach of their fiduciary duties, during the Relevant Period, three of the Individual Defendants engaged in lucrative insider sales, netting proceeds approaching ***$2 million.***

183. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard

for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Teladoc's securities.

184. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Teladoc's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

185. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

186. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Teladoc has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187. Plaintiff, on behalf of Teladoc, has no adequate remedy at law.

**THIRD CLAIM**
**Against Individual Defendants for Unjust Enrichment**

188. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Teladoc.

190. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Teladoc that was tied to the performance or artificially inflated valuation of Teladoc, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

191. Plaintiff, as a shareholder and a representative of Teladoc, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

192. Plaintiff, on behalf of Teladoc, has no adequate remedy at law.

## FOURTH CLAIM
## Against Individual Defendants for Waste of Corporate Assets

193. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

195. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Teladoc to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

196. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

197. Plaintiff, on behalf of Teladoc, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

198. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Teladoc in a manner consistent with the operations of a publicly held corporation.

200. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Teladoc has sustained and will continue to sustain significant damages.

201. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

202. Plaintiff, on behalf of Teladoc, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Individual Defendants for Abuse of Control**

203. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Teladoc, for which they are legally responsible.

205. As a direct and proximate result of the Individual Defendants' abuse of control, Teladoc has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206. Plaintiff, on behalf of Teladoc, has no adequate remedy at law.

## SEVENTH CLAIM
## Against Defendants Gorevic and Murthy for Contribution Under Sections 10(b) and 21D of the Exchange Act

207. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208. Teladoc and Defendants Gorevic and Murthy are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Gorevic's and Murthy's willful and/or reckless violations of their obligations as officers and/or directors of Teladoc.

209. Defendants Gorevic and Murthy, because of their positions of control and authority as officers and/or directors of Teladoc, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Teladoc, including the wrongful acts complained of herein and in the Securities Class Action.

210. Accordingly, Defendants Gorevic and Murthy are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15

U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

211. As such, Teladoc is entitled to receive all appropriate contribution or indemnification from Defendants Gorevic and Murthy.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Teladoc, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Teladoc;

(c) Determining and awarding to Teladoc the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Teladoc and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Teladoc and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;
2. a provision to permit the shareholders of Teladoc to nominate at least five

candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Teladoc restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: June 18, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

# VERIFICATION

I, Anand Roy, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 17th __ day of June, 2024.

DocuSigned by:

Anand Roy

241669D16B9A4F5...

Anand Roy